**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| LISA L. MARCONI, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 13-1505 |
| | ) | Judge Nora Barry Fischer |
| | ) | |
| MOON AREA SCHOOL DISTRICT, | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

### I.    INTRODUCTION

This is an age discrimination case wherein Plaintiff Lisa Marconi ("Marconi") contends that Defendant Moon Area School District ("Moon" or the "District") unlawfully denied her employment applications for entry level teaching positions in three successive school years, (i.e., 2010-2011; 2011-2012; and 2012-2013), in violation of the Age Discrimination in Employment Act ("ADEA") and the Pennsylvania Human Relations Act ("PHRA"). (Docket No. 1). Marconi further avers that Moon retaliated against her after she filed three separate charges against the District with the Equal Employment Opportunity Commission ("EEOC") complaining of unlawful discrimination in 2010, 2011 and 2012, each of which she also filed with the Pennsylvania Human Relations Commission ("PHRC"). (*Id.*). Presently before the Court are cross motions for summary judgment filed by the parties which have been exhaustively briefed in accordance with Local Rule 56, argued to the Court at a motion hearing held on January 9, 2015, and supplemented through additional briefing subsequent to the hearing. (Docket Nos. 23-29, 30-34, 38-50, 53-59, 61-62, 65, 68).

After careful consideration of the parties' positions and having evaluated all of the

1

evidence of record in light of the appropriate standard governing motions for summary judgment, and for the following reasons, Marconi's Motion for Summary Judgment [23] is denied and Moon's Motion for Summary Judgment [31] is granted, in part and denied, in part. In short, Moon's Motion is granted only to the extent that Marconi claims in her Complaint that Moon retaliated against her after she filed her third EEOC charge in October of 2012 but is denied in all other respects.

II.     BACKGROUND

A. *Moon School District and its Hiring Procedures*

Moon is a large public school district located northwest of Pittsburgh. Moon employs approximately 293 permanent teachers and also hires additional day-to-day and long-term substitute teachers on an as-needed basis. (Docket No. 39 at ¶ 9). Long-term substitute teachers are non-bargaining employees and are hired on a contract basis to cover the class schedule of a permanent teacher who is out on an extended leave. (Pl. Ex. 39, Docket No. 47-19). Day-to-day substitute teachers are also non-bargaining employees and are hired at a daily rate to cover for a full-time teacher who is out for a shorter period of time, such as a day or a few weeks. (*Id.*). Moon maintains a substitute list from year-to-year which contains all of the individuals who are able to work as a day-to-day substitute teacher during the school year. (Pl. Ex. 43, Docket No. 58-1).

The number of open permanent and long-term substitute teaching positions varies from school-year to school-year. (Docket No. 39 at ¶¶ 10-15). The process utilized by the District to fill those positions is also slightly different. (*Id.* at ¶¶ 20, 38). Pursuant to Moon's collective bargaining agreement with the teachers' union, the Moon Education Association, permanent teaching positions are initially open to a bidding process restricted to current union members and

if the position is not filled during the bidding process, it is opened to outside candidates, including substitute teachers. (*Id.* at ¶¶ 17-18). Open permanent teaching positions are posted on the PA Educator website which is a system used by many school districts throughout the Commonwealth to accept applications from interested teaching candidates. (*Id.* at ¶ 21). Outside candidates submit applications according to the instructions of these postings. (*Id.*). Moon also has an established practice of considering individuals on its substitute list and other applications it has "on file" from individuals who also meet the qualifications for the particular opening. (*See Brown Depo* at 22-25, Pl. Ex. 2). An administrative assistant compiles the applications of candidates who meet the minimum requirements and forwards them to the assistant superintendent in charge of human resources. (*Id.*).

The evaluation of candidates for permanent teaching positions is a multi-step process. (Docket No. 39 at ¶ 20). The first step involves school administrators reviewing the applications forwarded by the administrative assistant and then conducting first round interviews. (*Id.* at ¶ 22). At this initial step, administrators are looking for strong reference letters, quality grade point average, certifications in the discipline associated with the opening and prior teaching experience. (*Id.* at ¶ 23). Candidates who are interviewed are asked the same questions and scored on a scale of 1-5 by all of the interviewers. (*Id.* at ¶ 24). The second round involves the candidates teaching a mock lesson. (*Id.* at ¶ 25). The administrators then recommend three or four candidates to be granted final interviews. (*Id.* at ¶ 26). The final interviews are conducted by the superintendent, who is sometimes accompanied by another administrator. (*Id.* at ¶ 26). The same questions which were utilized in the initial round are posed to the candidates by the superintendent and/or other administrator and are then scored on the same scale. (*Id.* at ¶¶ 26-27). These final interviews typically last approximately 30 minutes. (*Id.* at ¶ 28).

The hiring of long-term substitute teachers is often less formal, depending on the type and length of the particular opening. (Docket No. 39 at ¶¶ 37-38). This process typically involves the school principal and the assistant superintendent assigned to human resource matters conducting interviews and making the recommendation for hire. (*Id.* at ¶¶ 37-39). Occasionally, the superintendent becomes more involved and participates in the interview process to fill the long-term substitute position. (*See Milanovich Depo* at 41-42, Pl. Ex. 10). But, in some instances, formal interviews are not conducted and the administrators make a recommendation directly to the superintendent. (Docket Nos. 39 at ¶ 37; 55 at ¶ 19). When interviews are held, the same questions and scoring system are utilized as for permanent positions. (Docket No. 39 at ¶¶ 29, 31). The assessments reflected in the scores on the interview sheets are then used by the administrators to make a recommendation to the superintendent. (*Id.*). Moon concedes that the interview ratings assigned to candidates on the interview forms are subjective. (Docket No. 55 at ¶ 7).

It is the superintendent's responsibility to recommend the preferred candidates for both permanent and long-term substitute positions to the School Board and such individuals are subject to a yes or no vote at the School Board meeting. (Docket No. 39 at ¶¶ 36, 39). The School Board routinely accepts the recommendation of the superintendent and authorizes the hiring of the recommended individual by the District. (*Id.* at ¶¶ 40-43). Given this process, the School Board members are typically unaware of the unsuccessful candidates when they vote on the recommended individuals. (*Id.*).

Dr. Donna Milanovich was the superintendent at Moon during all relevant times and was involved in all of the challenged hiring decisions. It is also undisputed that "Milanovich has the final say in recommendations for hire to the School Board." (Docket No. 55 at ¶ 167). The other

administrators involved in the hiring process changed during this period and are noted below to the extent that their involvement in the particular hiring is material to the hiring decisions.

### B. Lisa Marconi's Background and Experience

Marconi is presently 49 years old. (Pl. Ex. 40, Docket No. 47-20). She did not initially pursue teaching as a profession. (Docket No. 47-1). Rather, she earned a Bachelor of Arts from Gannon University in 1987 in communications/English. (*Id.*). She worked in communications for many years at a local television station in Ohio and then left the workforce around 1991 to raise her children. (*Marconi Depo* at 13-14, Pl. Ex. 8, Docket No. 43-1). Marconi returned to the workforce in 2003 as an instructional aide training at-risk students. (*Id.*). At that point, she decided to return to school in order to pursue a career as a teacher. (*Id.* at 15-16). She also moved to the Pittsburgh area around this time, residing in Moon. (*Marconi Depo* at 14-15).

Marconi earned a Master of Arts in Teaching from the University of Pittsburgh in 2006, achieving a 4.0 grade point average ("GPA") in the program. (Docket No. 47-1). As part of her studies, she completed an internship at Chartiers Valley School District during the 2005-2006 school year. (*Id.*). Marconi is dual-certified in Pennsylvania as a Secondary English teacher in grades 7-12 and as a librarian. (Docket No. 39 at ¶¶ 2-3). After earning her Masters' degree, Marconi worked as a substitute teacher for a number of different school districts from 2006-2011. (*Id.* at ¶¶ 5-6). In particular, Marconi worked as a long-term substitute teacher at Moon for periods during the 2006-2007, 2007-2008, 2009-2010 and 2010-2011 school years. (*Id.* at ¶ 5). At various time throughout this period teaching at Moon, Marconi had additional duties including: working as the faculty sponsor for the student newspaper; instructing homebound students; conducting SAT preparation courses; and acting as a reading remediation program facilitator. (Docket No. 55 at ¶¶ 17, 23, 67).

Marconi was recommended highly by a number of individuals, including Moon administrators and fellow teachers, a former professor at Pitt and an administrator from Chartiers Valley, where she completed her internship. (Pl. Exs. 34, 35, Docket Nos. 47-14; 47-15). Her teaching was also rated as "proficient" and "satisfactory" by the District in reviews conducted during her service as a long-term substitute. (Docket No. 32-7; Pl. Ex. 38, Docket No. 47-18).

### C.  *Hiring Decisions for 2010-2011 School Year*

In July of 2010, Marconi was a finalist for two permanent teaching positions and a long-term substitute position for the following school year, all of which were in the High School English Department. (Docket No. 39 at ¶¶ 44-45). Marconi was 44 years old. (*Id.* at ¶ 55). She was recommended by the High School principal, Michael Hauser, and was not required to make the second round teaching demonstration because she had taught in the District as a long-term substitute during the prior school year. (Docket Nos. 39 at ¶ 46; 55 at ¶ 44; *Hauser Depo* at 77, Pl. Ex. 4). Three other candidates, Nicole Wilson, James Mangan and Brittany Tonio, were also finalists for the positions. (Docket No. 39 at ¶¶ 48; 55). Wilson, Mangan and Tonio were all 24 or 25 and had only recently graduated from college and/or graduate school. (Pl. Ex. 41 at 1-2). Wilson and Mangan both had undergraduate degrees and completed internships but had less than one year of substitute teaching experience. (Docket No. 55 at ¶¶ 65-66; Def. Ex. 32-8 at 9-11). Tonio had recently completed the same Masters of Arts program at Pitt that Marconi had finished years earlier. (Docket No. 32-8 at 12-13). Tonio did an internship during her graduate studies at Pitt and had a few months of substitute teaching experience. (*Id.*).

All four of these candidates were subject to interviews with Milanovich and Ronald Zangaro in July of 2010. (Docket No. 39 at ¶¶ 48; 55). Zangaro had recently retired and was acting as a consultant but he was the assistant superintendent assigned to human resources

functions until the end of June.  (Pl. Ex. 18, *Zangaro Depo* at 116-118, Docket No. 46-3).  The District maintained the interview sheets which outline the questions posed to the candidates and contain contemporaneous notes taken by the Milanovich and Zangaro during the interviews. (Def. Ex. E, Docket No. 32-7 at 5-16).  Milanovich scored the interviewees in the relevant categories but Zangaro did not fill out scores on the sheets.  (*Id.*).  Milanovich assessed Marconi with the lowest scores of these four candidates (i.e., Wilson 30/30; Mangan 28/30; Tonio 28/30; Marconi 22/30), and Marconi was not offered a position.  (*Id.*; Docket No. 39 at ¶¶ 50, 55). Instead, Milanovich recommended Wilson and Mangan for the permanent positions and Tonio for the long-term substitute position.  (Docket No. 39 at ¶¶ 51, 55). At their depositions, neither Milanovich nor Zangaro recalled any specifics from the interviews they conducted.  (*See Milanovich Depo*, Pl. Ex. 10; *Zangaro Depo,* Pl. Ex. 18).  However, they each confirmed that the interview sheets maintained by the District contained their handwriting and were filled out contemporaneously during the interviews.  (*Id.*).  Milanovich testified as to her general practices in utilizing the scoring system during interviews, explaining how a candidate would need to perform during the interview to earn a certain score in each of the categories.  (*See Milanovich Depo*).

After the final interviews but before the recommendations were made to the Board to hire Wilson and Mangan, Hauser intervened and spoke to Milanovich on Marconi's behalf, hoping to get her to reconsider the decision not to offer her a permanent position.  (Docket No. 55 at ¶¶ 47-51).  Per Hauser, Milanovich told him that there was a problem with Marconi's interview but he believed that he successfully advocated on her behalf and convinced Milanovich to reconsider and extend her the offer.  (*Id.*).  Hauser and Marconi provided contradictory testimony regarding their conversations.  (*Id.*).  Marconi appeared convinced that Hauser told her she would be

getting one of the permanent positions while Hauser admitted that he misinterpreted Milanovich and told Marconi that she was the candidate but did not guarantee her the position. (*Id.*) Marconi admitted during her deposition that Hauser told her that Milanovich felt that she was very nervous during the interview and had not performed well. (Pl. Ex. 8, *Marconi Depo* at 70-72). Marconi also added that Hauser expressed dissatisfaction with the decision to hire the other candidates, commenting that the District didn't know these candidates and they were less qualified than she was. (Docket No. 55 at ¶¶ 50-51).

Milanovich recommended these three candidates to the Board and they were all hired. (Docket No. 39 at ¶¶ 51, 55). Tonio started the school year in the long-term substitute position but resigned shortly thereafter. (Docket No. 34 at n.3). On September 27, 2010, Moon hired another younger individual, Danelle Ciafre, to replace Tonio. (Docket Nos. 1 at ¶¶ 15, 16; 6 at ¶¶ 15, 16; Def. Ex. E, 32-8 at 3, 7). There is no evidence in the record indicating that Marconi was considered to replace Tonio after her resignation or the process, if any, which was utilized by the District to hire Ciafre. To the extent that Ciafre was a candidate during the July 2010 interviews, no record of her scores has been presented to the Court. It is undisputed that the teachers at Moon went on strike for a period of approximately three weeks in November of 2010. (Def. Ex. E, Docket No. 32-7 at 4). Another long term substitute teaching position opened up when teacher Jordan Galino announced that she was going on leave. (Def. Ex. E, Docket No. 32-8 at 3). Because Marconi had taught Galino's classes as a long-term substitute in the 2009-2010 school year, Hauser recommended that Marconi be hired to Milanovich, who carried the recommendation forward to the School Board for approval. (Pl. Ex. 8, *Marconi Depo* at 40-45). Marconi then served as a long term substitute teacher in Ms. Galino's class for the balance of the 2010-2011 school year, starting at the conclusion of the strike. (*Id.*).

*D. Marconi's Experience as Long-Term Substitute in 2010-2011 School Year*

Marconi filed her first EEOC charge on December 14, 2010 alleging age and gender discrimination with respect to the failure to hire her for the permanent and long-term substitute positions. (Pl. Ex. 12, Docket No. 29-4). Milanovich was aware that this discrimination complaint was filed against the District, although she could not recall when she was alerted of this fact. (Docket No. 55 at ¶ 168). She advised that the assistant superintendent in charge of human resources, Zangaro and/or Cynthia Zurchin also would have been aware of the EEOC charge. (*Milanovich Depo*). However, there was no superintendent in charge of human resources at the time of the filing of the charge as Zangaro had left the District in August of 2010 and Zurchin did not join the District as an assistant superintendent until February 2011.

Barry Balaski was hired as the high school principal in April of 2011. (Docket No. 55 at ¶ 77). Hauser remained with the District until the end of the 2010-2011 school year. (*See Hauser Depo* at 81-85). Hence, there was a period of overlap of their tenures as principal of approximately two months. The parties agree that there was an incident in Marconi's class during the spring of 2011 which involved a student making a negative posting about Marconi on a website, www.ratemyteacher.com. (Docket No. 55 at ¶ 79). The parties dispute the core facts of what occurred during this incident: Marconi testified that it was handled professionally while the District, primarily through Balaski, claims that she made a spectacle out of a student in class for which she was reprimanded. (*Id.* at ¶¶ 80-85, 91). They agree, however, that the student and his parents complained about Marconi's handling of the situation and principals, including Hauser and Balaski, became involved. (*Id.*). A performance evaluation completed by Hauser on June 11, 2011 notes that "[a]ll student and parent complaints were investigated and culminated in a meeting between teacher and administrators to discuss the issues. The outcome of the

discussion was positive and productive. No further problems were reported." (Docket No. 32-7 at 1).

Some of the administrators also perceived problems with Marconi's dress; others denied having issues any with her dress. (Docket No. 55 at ¶¶ 98-109). Balaski testified that students expressed concerns to him about Marconi's dress and he states that he observed her wearing low cut, form fitting tops that were inappropriate for a female teacher to be wearing in a high school setting. (Docket No. 55 at ¶ 98). He recalled discussing her style of dress with Hauser; although Hauser denied any recollection of such a conversation with anyone at the District. (*Hauser Depo* at 85, Docket No. 42-11 at 22). Zurchin testified that she did not remember Marconi at all and believed the only time that she may have seen her at the school was on an occasion when another District employee, possibly Milanovich, pointed out what was felt to be Marconi's improper short skirt or dress to her while they were walking through the halls of the school near the lunch room around this time. (*Zurchin Depo* at 83). Yet, Milanovich denies ever having a discussion with anyone about Marconi's dress. (*Milanovich Depo* at 195). Moon admits that no one ever communicated these concerns about her style of dress to Marconi, who denied that she ever dressed inappropriately while teaching. (*Marconi Depo* at 144-145; Docket No. 55 at ¶¶ 99-100, 110-111). Balaksi also testified that Marconi had an issue with establishing relationships with students and her delivery of the curriculum; other administrators denied having such concerns with her performance. (Docket No. 55 at ¶¶ 87-96, 112-117). It is undisputed that these concerns were never brought to Marconi's attention prior to her filing this lawsuit. (*Id.* at ¶¶ 97, 118).

Marconi's long-term substitute position teaching Galino's classes ended at the conclusion of the 2010-2011 school year. (Docket No. 32-7).

There were no permanent teaching positions open during the 2011-2012 school year for which Marconi was qualified. (Docket No. 39 at ¶ 58). However, at some point during the summer months, Galino advised Moon that she would be extending her leave into the coming school year. Milanovich and Balaski discussed this position but they provided contradictory testimony about when and what they discussed. As noted above, Milanovich was aware of Marconi's first EEOC charge at this time. (Docket No. 55 at ¶ 168). Balaski testified that he decided to hold open interviews for the position rather than offer it to Marconi who had taught Galino's class the prior year and that Milanovich approved this decision. (Docket No. 55 at ¶¶ 78, 168). He also recalled a later conversation when he presented Erin Berger as the candidate for hire to Milanovich; causing her to comment to him that Marconi "was not going to be happy not being chosen as the candidate" and that she had filed a complaint against the District. (*Id.* at ¶ 170). In contrast, Milanovich testified that she only recalled a single conversation with Balaski concerning this position and that it occurred after he had made the recommendation to hire Berger as the candidate. (*Milanovich Depo* at 87). Both Milanovich and Balaski claimed that he did not become aware of Marconi's complaint until after he made the recommendation for hire. (*Milanovich Depo* at 87; *Balaski Depo* at 139).

Returning to the open position, Balaski, and assistant principals Ashley Porter and Susan Kazmierczak conducted interviews of three candidates for this long-term substitute position: Marconi; Berger; and Jessica Yurjevich. (Docket Nos. 39 at ¶ 59; 55 at ¶ 72). Berger and Yurjevich were both in their early 20s. (Pl. Ex. 39). Berger had a Bachelors' degree, and completed an internship but had only a few months of substitute teaching experience, none of which was gained teaching English. (Pl. Ex. 30, Docket Nos. 47-10; 55 at ¶¶ 132-133). The

administrators utilized the same questions as the interviews conducted in the prior school year but maintained more robust notes and also completed a separate form report outlining each candidate's scores and their recommendations. (Def. Ex. E, Docket No. 32-7 at 17-43). Berger scored the highest, earning 10 more points than Marconi and the administrators recommended Berger for hire. (*Id.*). Marconi scored higher than Yurjevich in the scoring but there was only one position open. (Docket No. 39 at ¶ 63). Berger and Marconi were both assessed as "exceptional" in the category of experience by the administrators. (Pl. Exs. 29; 32, Docket Nos. 47-10; 47-12).

Around the same time, the District sent out class schedules to incoming students listing Marconi as the teacher for Galino's classes. (Docket No. 55 at ¶ 73). Marconi's daughter received the schedule and shared it with her mother which led Marconi to believe she would be hired. (*Id.*). Balaski testified that he erred by sending out the schedule with Marconi's name on it. (*Balaski Depo* at 146). The parties also dispute the circumstances surrounding the District's notification to Marconi that she was not recommended as a candidate. Marconi testified that Porter called her and provided the news that she was not hired because the other candidate was more qualified. (Docket No. 55 at ¶ 74). She added that she was professional during the brief call. (*Marconi Depo* at 117-118, Pl. Ex. 8). Balaski explained that the interview team made a call to Marconi to advise her of the decision. (*Balaski Depo* at 145-146, 180, 185, Pl. Ex. 1). He testified that Marconi responded unprofessionally, in a self-centered manner, commented to them that the person you hired had better be a great candidate and hung up the phone on him. (*Id.*). Marconi denied that Balaski or Kazmierczak ever spoke to her about this position. (*Marconi Depo* at 117-118).

Moon admits that Milanovich made the above comment about Marconi having filed a

complaint against the District when she received the recommendation from Balaski. (Docket No. 55 at ¶ 170). Balaski likewise testified that he told Kazmierczak about Marconi's claims, although he could not recall the precise contours of their discussion. (Docket No. 55 at ¶ 171). Milanovich elected not to interview the candidates and took the recommendation to hire Berger to the next School Board meeting, at which time the hire was authorized. (*Id.* at ¶ 168). Berger worked for a few months in this position and then Galino returned from leave in November.[1] (Pl. Ex. 30, Docket No. 47-10).

Marconi filed her second EEOC charge on September 8, 2011 alleging that Moon committed age discrimination and retaliation when it did not hire her for this long-term substitute position. (Docket No. 32-6 at 15). Milanovich once again admitted that she would have been alerted to this charge in the normal course of business but could not recall when she received notice of same. (*Milanovich Depo* at 87-89). She likewise advised that the assistant superintendent assigned to human resources, Zurchin, would have been aware of the charge. (*Id.*). She also provided the charge to the District's solicitor, as she had done with the prior charge the District received. (*Id.*).

Marconi continued to work as a day-to-day substitute teacher during this school year for a number of different school districts, including Moon. (*See* Def. Ex. D). She remained on the District's substitute list for the duration of the 2011-2012 school year. (Pl. Ex. 43, Docket No. 58-1). At the conclusion of the school year, Marconi mailed two application packets to Moon administrators, Zurchin and Melissa Heasley, who was the middle school principal, expressing interest in any positions that may be available for the upcoming school year. (Docket No. 55 at ¶ 143, 144). She testified that she sent a follow-up email to Zurchin, again expressing her interest

---

[1] According to her resume, Berger also worked for Moon as a long-term substitute teacher in 11th and 12th grade English from November 2011 to December 2011. (Pl. Ex. 30, Docket No. 47-10). It is unclear what procedures, if any, were utilized by Moon in filling this position but it does not appear that Marconi was a candidate.

in a permanent position with the District. (*Id.* at ¶ 144). Moon denies having received these applications and the email that Marconi referenced during her testimony. (*Id.* at ¶¶ 143-144).

### F. Moon's Hiring Decisions for 2012-2013 School Year

Moon had two openings for permanent English teaching positions for the 2012-2013 school-year for which Marconi was qualified: one at the High School and another at the Middle School. (Docket No. 55 at ¶ 143). Moon claims that Marconi did not apply for the positions; Marconi disputes this fact given that she mailed the applications and remained on the substitute list. (Docket No. 55 at ¶¶ 142-144, Pl. Ex. 43). The administrative assistant, Lisa Brown, testified that she provided a list of all individuals on the District's substitute list to a group of administrators including Balaski, to consider as potential candidates. (Docket No. 55 at ¶ 151). Balaski could not recall if Marconi's name was on the list of potential candidates that he was provided. (*Id.* at ¶ 135). Moon conducted interviews for these positions in July of 2012. (Pl. Ex. 42, Docket No. 47-22). Marconi was not contacted for an interview. (Docket No. 55 at ¶ 134). Balaski testified that he did not consider interviewing Marconi for the positions, regardless of whether she applied or not. (*Id.* at ¶ 139).

Balaski, Kazmierczak, Zurchin and Milanovich, among others, were all involved in the hiring process which involved finalists: Berger, George Fearns and Kady Wagner. (Docket No. 55 at ¶¶ 136, 138). The principals, Balaksi and Heasley, recommended their preferred candidates to Milanovich, Berger and Wagner, both of whom were 25 year old women. (Docket No. 55 at ¶¶ 140-141). Milanovich then carried the recommendations to the School Board. (*Id.*). Berger was hired for the permanent High School English teacher position on July 23, 2012. (Pl. Ex. 41, Docket No. 47-21). Wagner was hired for the permanent Middle School English teacher position on August 13, 2012. (Pl. Ex. 41, Docket No. 47-21).

### G. Moon's Investigation of EEOC Charges and Position Statement

Moon filed its Position Statement in response to Marconi's first two EEOC charges on August 10, 2012. (Def. Ex. W, Docket No. 32-38). Milanovich admitted that she met with counsel and provided information regarding the response to the EEOC. (*Milanovich Depo* at 183). The District also advised that Milanovich and Zurchin were individuals who investigated Marconi's claims as contained in the EEOC charges on Moon's behalf. (Pl. Ex. 41, Docket No. 47-21 at 8). In its Position Statement, Moon argued to the EEOC that "Marconi was not as qualified for the two permanent positions as the other applicants that were hired [for the 2010-2011 school year] and that […] Marconi simply did not have the experience that the other applicants had to teach in these positions." (Def. Ex. W, Docket No. 32-28). Moon added that "[t]he School District's recollection of Ms. Marconi's interview and the other applicants' interviews is one of not being as impressed with Ms. Marconi as with the other applicants who were ultimately hired for the two permanent positions Notably, the male and female applicants scored higher than […] Marconi on all of the interview questions." (*Id.*). The District explained to the EEOC that Marconi was not hired for the 2011-2012 long-term substitute position because she scored lower in the interview assessment than the successful candidate. (*Id.*). The District denied that it discriminated against Marconi based on her age or retaliated against her for her filing the prior EEOC charge. (*Id.*).

### H. Marconi's Third EEOC Charge

Marconi filed a third EEOC charge on September 20, 2012 alleging that she was subject to discrimination and retaliation based on Moon's failure to interview and/or hire her for the permanent teaching positions for the 2012-2013 school year. (Pl. Ex. 40, Docket No. 47-20). Marconi admits that Moon did not receive her third EEOC charge. (Docket No. 39 at ¶ 80).

Indeed, it was obtained by Marconi via a Freedom of Information Act ("FOIA") request that her counsel served on the EEOC during the course of this litigation and produced to the District at that time. (Pl. Ex. 40, Docket No. 47-20).

## I. Marconi's Post-Teaching Career

Marconi substitute taught for a number of school districts at the beginning of the 2012-2013 school year but not at Moon. (*Marconi Depo* at 51-52). In mid-October, she accepted a position as a corporate trainer for Service Link and has worked in this position until the present. (Docket No. 39 at ¶ 8). Marconi testified that she enjoys her current work but would still prefer to obtain a permanent position as a teacher. (*Marconi Depo* at 48-53).

## III. PROCEDURAL HISTORY

Marconi filed this case on October 17, 2013, setting forth age discrimination and retaliation claims against Moon, which it denied in its Answer filed on December 17, 2013. (Docket Nos. 1, 6). The parties' efforts at resolving the matter through Court-ordered mediation were unsuccessful and the case continued through discovery, which ended on August 13, 2014. (Docket Nos. 18, 20). At the conclusion of discovery, the parties filed cross motions for summary judgment, supporting briefs, concise statements of material facts and appendices on October 16 and 17, 2014. (Docket Nos. 23-34). Responsive briefs, counterstatements of facts and appendices followed on November 25, 2014. (Docket Nos. 39-50). By December 16, 2014, both parties replied, in turn, and responded to their opponents' additional factual materials. (Docket Nos. 53-55). Sur-reply briefs were then submitted by both parties on December 19, 2014. (Docket Nos. 56-57).

The Court held a motion hearing on January 9, 2015 during which the parties presented oral argument through their respective counsel. (Docket No. 59; *Hr'g Trans. 1/9/15*). After the

hearing, Marconi submitted a document, i.e., the 2011-2012 substitute list, which Moon previously failed to produce and the Court questioned counsel about during the hearing. (Pl. Ex. 43, Docket No. 58-1). Supplemental briefing ensued with both parties filing supplemental briefs and oppositions thereto, all of which were filed by February 11, 2015. (Docket Nos. 61, 62, 65, 68). The parties then advised the Court on March 19, 2015 that they were not interested in returning to mediation at the present time and the matter was taken under advisement. Needless to say, the pending cross motions for summary judgment have been exhaustively briefed and are now ripe for disposition.

IV.     LEGAL STANDARD

It is well-established that summary judgment is appropriately entered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A fact is material if it might affect the outcome of the suit under the governing law." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013) (citation omitted). In deciding a motion for summary judgment, the Court's function is not to weigh the evidence, to determine the truth of the matter, or to evaluate credibility. *See Montone v. City of Jersey City, et al.*, 709 F.3d 181 (3d Cir. 2013). Rather, the Court is only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the non-moving party. *Id.* In evaluating the evidence, the Court must interpret the facts in the light most favorable to the non-moving party, and draw all reasonable inferences in favor of the non-movant. *Watson v. Abington Twp.*, 478 F. 3d 144, 147 (3d Cir. 2007).

V.     DISCUSSION

Marconi has set forth age discrimination and retaliation claims against Moon, all of which are the subject of the pending Motions for Summary Judgment. (Docket Nos. 1, 23, 31).

The Court will first adress the parties' Motions as to the age discrimination claims and then will evaluate their arguments with respect to the retaliation claims.

### A. Discrimination Claims

The parties agree that Marconi has presented no direct evidence that Moon discriminated against her based on her age and that her claims under the ADEA[2] and PHRA[3] are properly evaluated under the familiar burden shifting framework set forth in *McDonnell-Douglas Corp. v. Green,* 411 U.S. 792 (1973). (Docket Nos. 24, 34, 38, 50). Under *McDonnell-Douglas*, Marconi has the initial burden to establish a *prima facie* case of age discrimination. *See Burton*, 707 F.3d at 425-26. To establish a *prima facie* case of age discrimination based on a failure to hire, a plaintiff must show that: (1) she is forty years of age or older; "(2) the defendant failed to hire [her]; (3) [she] was qualified for the position in question; and (4) conditions giving rise to an inference of discrimination accompanied the failure to hire [her]." *Landmesser v. Hazleton Area Sch. Dist.*, 574 F. App'x 188, 189 (3d Cir. 2014) (citing *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003)). If Marconi presents sufficient evidence to support a *prima facie* case, the burden of production shifts to Moon "to offer a legitimate, nondiscriminatory reason" for its employment decisions and, if Moon meets this "relatively light" burden, the burden shifts back to Marconi to present sufficient evidence from which a reasonable jury could conclude that the employment decision was a pretext for discrimination. *Id.* Despite the burden-shifting procedure, Marconi always retains the burden of persuasion to prove that she was not hired by Moon "but for" or "because of" her age. *Smith v. City of Allentown*, 589 F.3d 684, 691 (3d Cir.

---

[2] The ADEA provides that it is unlawful to "discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).

[3] The relevant portion of the PHRA states that "[i]t shall be an unlawful discriminatory practice … (a) For any employer because of the [ … ] age [ …] of any individual or independent contractor, to refuse to hire or employ or to contract with [ … ] or to otherwise discriminate against such individual or independent contractor with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract, if the individual or independent contractor is the best able and most competent to perform the services required." 43 Pa. Stat. § 955(a).

2009).

Marconi claims that Moon committed age discrimination by declining to hire her for several different permanent and long-term substitute teaching positions during three successive school years, i.e., 2010-2011; 2011-2012; and 2012-2013, in favor of several substantially younger individuals, all of whom were all around twenty years younger than she was at the time. (Docket No. 1). The Court now turns to its evaluation of the claims under *McDonnell-Douglas* for each of the separate school years, in turn.

### 1. 2010-2011 School Year

Moon concedes for purposes of summary judgment that Marconi has established her *prima facie* case regarding the denials of her employment applications in 2010-2011. (Docket No. 34). The Court's independent review of the record confirms that she has met her burden to demonstrate a *prima facie* case for her claims arising from this school year. To this end, Marconi was 44 years old when she applied for two open permanent high school English teaching positions and one long-term substitute high school English teaching position; she was a finalist for each of the three positions and among at least four individuals interviewed for these positions; and, Moon hired substantially younger candidates to fill these roles (i.e., Nichole Wilson, James Mangan, and Brittany Tonio), all of whom were 24 or 25. (*See* Docket Nos. 47-1; 47-10; 39 at ¶¶ 2, 3; 48, 55 at ¶¶ 17, 23, 65-67; Pl. Ex. 41; Def. Ex. 32-8 at 9-13). Hence, the burden shifts to Moon to provide its legitimate nondiscriminatory reasons for declining to hire Marconi for these positions. *Fuentes*, 32 F.3d at 763.

The burden placed on an employer to articulate legitimate non-discriminatory reasons for its employment actions is "relatively light." *Id*. Indeed, "[t]he employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there

was a non-discriminatory reason for the unfavorable employment decision." *Id.* at 763. "This burden is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000) (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252-253 (1981)).

Despite this low standard, Marconi affirmatively moves for summary judgment arguing that Moon has failed to provide a legitimate non-discriminatory reason for its decision to decline her application for the open permanent positions in the 2010-2011 school year. (Docket No. 24). Moon counters that it has more than satisfied its burden as it proffers that Marconi was not hired because she was outperformed in her final interview by the other candidates. (Docket No. 50). Moon supports this argument with the score sheets from the interviews of all four of the candidates showing that Marconi obtained the worst overall scores of all of the finalists for those openings. (Def. Ex. E, Docket No. 32-7). Having considered the evidence in the light most favorable to the non-movant, Moon, the Court finds that the District has met its burden of production to present admissible evidence, which, taken as true, provides legitimate, non-discriminatory reasons for its hiring decisions. *See Reeves*, 530 U.S. at 142.

Initially, the Court of Appeals has held that it will not second guess the methods used by employers to evaluate employees, including purely subjective assessments, *see Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006), absent the utilization of "evaluating criteria which lacks any relationship at all to the performance of the employee being evaluated." *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 468 (3d Cir. 2005). It is undisputed that the interview process and scoring by the interviewers utilized by Moon in this case were subjective; Moon's witnesses admitted as much. (Docket No. 55 at ¶ 7). However, Courts have recognized that poor performance in an interview is a legitimate non-discriminatory reason to decline to hire a

particular candidate. *See e.g., Snooks v. Duquesne Light Co.*, 314 F. App'x 499, 505 (3d Cir. 2009) (noting that Defendant's "proffered non-discriminatory reason for hiring [the candidate] is that she performed better in the second interview"); *Thompson v. Bridgeton Bd. of Educ.*, No. CIV.A. 12-6864 NLH, 2014 WL 1301474 (D. N.J. Mar. 27, 2014) (citing *Carr v. New Jersey*, 534 F. App'x. 149, 152 (3d Cir. 2013)); *McCann v. Astrue*, 293 F. App'x. 848, 852 (3d Cir. 2008); *Green v. Potter*, No. 08–597, 2010 WL 2557218, at *5 (D.N.J. June 23, 2010) ("Poor performance in an interview is recognized as a legitimate nondiscriminatory reason for failure to hire or promote.").

Here, Marconi does not challenge any of the questions on the interview form which were utilized by the interviewers (Milanovich and Zagaro) as lacking any relationship to the positions to which she applied and she also admits that the District generally questioned each of the candidates consistent with the standardized forms. (*See* Docket No. 24). Although Milanovich recalled little of the specifics of the interviews she conducted, she was able to confirm that she contemporaneously recorded her assessment of the responses by the interviewees via the scores she wrote on the interview forms – the results of which showed her preference for the three other candidates and detail the scores that each received in the different categories. (Def. Ex. E, Docket Nos. 32-7; 39 at ¶¶ 50, 55; *Milanovich Depo generally*). Drawing all reasonable inferences in Moon's favor, as this Court must, it also appears that other evidence in the record supports the District's position that Marconi was outperformed in the interview including the rejection letter sent to Marconi[4] and Hauser's statements to Marconi that Milanovich had told

---

[4]    In a letter dated August 27, 2010, Milanovich wrote the following to Marconi:

> When our interviewing was over, and the teaching position that you had interviewed for was to be filled, we found the choice difficult. The candidates interviewed all had excellent qualifications. We regret to inform you that another candidate has been chosen for the position that you interviewed for. Our decision is likely to be disappointing to you, but in view of the high quality of

him that she seemed particularly nervous, indicating there were problems with her interview. (Docket Nos. 32-6 at 10; 55 at ¶¶ 47-51). In this Court's estimation, the admitted failures of Milanovich and Zangaro to recall specifics of the interviews raise significant credibility issues with their contemporaneous records upon which Moon relies and present disputes which the Court may not resolve in Marconi's favor, as she has suggested. *See Reeves*, 530 U.S. at 142 (the district court's evaluation of the employer's burden "can involve no credibility assessment."). Therefore, the Court agrees with Moon that it has presented sufficient evidence from which the trier of fact could conclude that Marconi was not hired because she did not perform as well as the other candidates during the oral interviews. *Id.* Accordingly, Marconi's Motion for Summary Judgment [23] is denied.

The next dispute between the parties relative to Moon's Motion for Summary Judgment for this school year is whether Marconi has presented sufficient evidence to show that Moon's proffered reasons for not hiring her are a pretext for unlawful age discrimination. (Docket Nos. 34, 38). To establish pretext, Marconi "must point to some evidence, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 761-64 (3d Cir. 1994).

> The plaintiff can discredit the proffered reasons by "demonstrat[ing] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [defendant's] proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the [defendant] did not act for the asserted non-discriminatory reasons." Alternatively, to show that

---

the candidates, you should not regard it as any reflection of your abilities.

(Docket No. 32-6 at 10).

> discrimination was the likely cause of the adverse action, a
> plaintiff can show, for example, that the defendant had previously
> subjected the same plaintiff to "unlawful discriminatory
> treatment," that it had "treated other, similarly situated persons not
> of his protected class more favorably," or that it had "discriminated
> against other members of his protected class or other protected
> categories of persons."

*Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 277 (3d Cir. 2010) (quoting *Fuentes*, 32 F.3d

at 764–65). The plaintiff must do more than prove that the employer was "wrong or mistaken";

she must "present evidence contradicting the *core facts* put forward by the employer as the

legitimate reason for its decision." *Tomasso*, 445 F.3d at 706 (emphasis in original) (internal

quotations omitted). Further, "the plaintiff's evidence rebutting the employer's proffered

legitimate reasons must allow a factfinder reasonably to infer that each of the employer's

proffered non-discriminatory reasons, [ ... ] was either a post hoc fabrication or otherwise did not

actually motivate the employment action (that is, the proffered reason is a pretext)." *Id.* (internal

citations omitted). Plaintiff is not required to cast doubt on each of the proffered reasons in a

vacuum, but "[i]f the defendant proffers a bagful of legitimate reasons, and the plaintiff manages

to cast substantial doubt on a fair number of them, the plaintiff may not need to discredit the

remainder." *Fuentes*, 32 F.3d at 764, n. 7. To this end, "the rejection of some explanations may

so undermine the employer's credibility as to enable a rational factfinder to disbelieve the

remaining rationales, even where the employee fails to produce evidence particular to those

rationales." *Tomasso*, 445 F.3d at 707 (citing *Fuentes*, 32 F.3d at 764, n. 7).

In this Court's opinion,[5] Marconi has presented a particularly strong *prima facie* case of

age discrimination because she was a finalist for three teaching positions for which Moon admits

she was qualified and the District hired three different individuals who were each around 20

---

[5]     The Court notes that the parties make much of the proper formulation of this test throughout their
supplemental briefing but such nuances in the law are not persuasive given the plainly disputed record precluding
summary judgment for either party. (*See* Docket Nos. 61, 61, 65, 68).

years younger than her to fill these roles. *See e.g., Reeves*, 530 U.S. at 148 ("a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."); *O'Conner v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 313 (1996) ("Because the ADEA prohibits discrimination on the basis of age and not class membership, the fact that a replacement is substantially younger than the plaintiff is a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class."); *Oransky v. Rite Aid, Inc.*, 2015 WL 732892, at *12 (E.D. Pa. Feb. 20, 2015) (finding pretext based on alleged preferred treatment to three comparators who were between 23-29 years younger than plaintiff). The District also relied upon admittedly subjective interview scoring assessments in reaching its hiring decisions which are of the type that the Court of Appeals has cautioned must be evaluated with care because such subjective analyses may be used to mask discriminatory behavior. *See Tomasso*, 445 F.3d at 706 ("low evaluation scores may be a pretext for discrimination, especially where [ … ] an employer uses subjective criteria such as 'attitude' and 'teamwork' to rate its employees."). The interview scores could be discredited by the factfinder simply because neither Milanovich nor Zangaro can recall any specifics from the interviews they conducted of the candidates and Milanovich could not recall with any real detail why she assessed any of the scores to these candidates. *See Hendricks v. Pittsburgh Public Schools*, 2015 WL 540030, at *7 (W.D. Pa. Feb. 10, 2015) (citing cases) (failure to recollect creates a jury question); *Bray v. Marriott Hotels*, 110 F.3d 986, 991 (3d Cir. 1997) ("An inference of pretext may arise if the plaintiff can raise suspicions with respect to the defendant's credibility."). Hence, the *core facts* put forth by Moon supporting its decisions – the interview scores – are subject to considerable impeachment such that the jury may find them unworthy of credence.

*See Tomasso*, 445 F.3d at 706.

The Court further finds that there are additional genuine disputes of material fact from which a reasonable jury could determine that Moon's articulated non-discriminatory reason of her poor oral interview performance is a pretext for discrimination.[6] To this end,

- The jury could determine that Moon has presented shifting and inconsistent reasons for the hiring decisions given that it has pronounced at times that all of the finalists were sufficiently qualified but later claimed that Marconi was "not as qualified" and "not as experienced" as the other candidates, (*see* Docket No. 32-6 at 10, Aug. 27, 2010 Letter; EEOC Response);

- Marconi has also presented evidence which the jury could credit that shows that she had superior qualifications to the other candidates, particularly given the District's claim that the other candidates had more experience than she did; a fact not borne out by this record. *Cf. Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006) ("Under this Court's decisions, qualifications evidence may suffice, at least in some circumstances, to show pretext."); *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 647 (3d Cir. 1998) ("the focus is on the particular criteria or qualifications identified by the employer as the reason for the adverse action."). Here, Marconi possessed a graduate degree while Wilson and Mangan had only undergraduate degrees. Marconi had four years of substitute teaching experience, including three years filling long-term substitute positions at Moon while the others had one year or less substitute teaching, (Docket Nos. 47-1; 39 at 2-6; 55 at ¶¶ 17, 23, 65-67; Pl. Ex. 41 at 1-2; Def. Ex. 32-8 at 9-13);

- The jury could also reject Moon's characterizations of Marconi's oral interview as "substandard" and "totally lackluster," as *post hoc* fabrications or rationalizations given that she scored a 3, "average," or 4, "good," in every category and received 22 of 30

---

[6] The Court notes that Marconi testified that she was told by another teacher who was then-working in the District, JoAnne Canan, that Milanovich "hires all young people." (Docket No. 55 at ¶ 52). Moon admits that Marconi so testified but contests the Court's consideration of this evidence as it is hearsay and unsupported speculation. (*Id.*). For reasons stated above, the Court finds that there are genuine disputes aside from this one that demand that this case be heard by a jury rather than decided at summary judgment. In any event, the Court notes that "[a]lthough evidence of discrimination against other workers may be used to prove pretext, *Fuentes*, 32 F.3d at 765, mere speculation and conjecture on the part of the plaintiff is no substitute for actual evidence, and cannot be relied upon to defeat an otherwise properly supported motion for summary judgment, *Kiburz v. England*, 361 F. App'x 326, 336 (3d Cir. 2010) (citing *Acumed LLC v. Advanced Surgical Servs.*, 561 F.3d 199, 228 (3d Cir. 2009))" *Sanders v. Triangle Printing Co.*, No. CIV.A. 1:09-CV-1851, 2010 WL 4365864, at *9 (M.D. Pa. Oct. 6, 2010), *report and recommendation adopted*, No. 1:09-CV-1851, 2010 WL 4386502 (M.D. Pa. Oct. 28, 2010).

possible points, making her an average to good candidate based on Moon's own scoring system and Milanovich's assessment, (Docket Nos. 34; 54; Pl. Ex. 22); and,

- At least for the long-term substitute position, Moon's reliance on the interview scores is undermined by the fact that Tonio resigned her position in September and she was replaced by another substantially younger teacher, Ciafre, but there is no record evidence of whether Ciafre was interviewed and subject to the same scoring system and/or also scored higher than Marconi. (*see* Docket No. 34 at n.3). Additionally, this hire took place more than a month before Marconi was hired for a separate long-term substitute position near the end of November.

Collectively, these facts present significant disputes between the parties on material issues in the case such that Moon's Motion for Summary Judgment [31] as to the hiring decisions for the 2010-2011 school year must be denied.

2. 2011-2012 School Year

The Court next evaluates Marconi's claim arising from the District's failure to hire her for a long-term substitute position during the 2011-2012 school year. (Docket No. 1). Notably, this position was the same one that Marconi held during portions of the prior two school years substituting for Galino while she was on separate leaves of absence. (Pl. Ex. 8, *Marconi Depo* at 109). The parties do not quarrel over Marconi's *prima facie* case or Moon's legitimate nondiscriminatory reason for not hiring her. (Docket Nos. 34, 38). Instead, their disputes surround whether Marconi has met her burden to demonstrate pretext and the Court focuses its analysis on this contested element of the claim. (*Id.*).

Briefly, Marconi's *prima facie* case consists of the following: she was 45 years old when she applied for an open long-term substitute position in high school English; she was a finalist for this position and one of three interviewees considered; and the individual who was hired, Erin Berger, who was only 24 at the time, was substantially younger than Marconi. (*See* Pl. Exs. 27;

30; 39; 41). Moon's legitimate non-discriminatory reasons for not hiring Marconi for this position included "Berger's superior interview and Marconi's performance the prior year" during her term as a long-term substitute teacher in High School English. (Docket No. 34).

Once again, the Court has reviewed the record in its entirety and finds that there are sufficient disputed facts in the record from which a reasonable jury could conclude that Moon's legitimate nondiscriminatory reasons were a pretext for age discrimination. *See Tomasso*, 445 F.3d at 706. At the outset, there are plainly disputes as to why this position was in effect reopened by the District, which has no established procedures for filling long-term substitute positions, leaving this decision wholly to the discretion of its administrators to determine when interviewing multiple candidates is necessary and when it is not. (Docket Nos. 39 at ¶¶ 37-39; 55 at ¶ 19). It is undisputed that Moon was not required to hire Marconi for this opening; she admitted as much. (Pl. Ex. 8, *Marconi Depo* at 105-106). However, a reasonable jury could find it more than curious that Marconi had been a long-term substitute for Galino in the two prior school years and was not required to interview for the position either time but was now subject to an interview for the same opening.[7] *See e.g., Gadling-Cole v. West Chester Univ.*, 2013 WL 4602848, at *12-14 (E.D. Pa. Aug. 29, 2013) (deviation from standard procedures may show pretext). The District's own witnesses provided conflicting versions of why the position was open for interviews. (Docket No. 55 at ¶¶ 78, 168; *Milanovich Depo* at 87; *Balaski Depo* at 139). Balaski testified that he requested from Milanovich that he be able to interview for the opening due to problems he perceived with her "classroom management" skills; yet, Milanovich denied that she was even aware that Marconi was a candidate or that she spoke to Balaski about this

---

[7] As noted above, Marconi was required to interview for the two permanent positions and another long-term substitute position in the 2010-2011 school year but when the second long-term substitute position opened up, she was simply recommended by Hauser and seconded by Milanovich, prior to the perfunctory approval by the Board. (Pl. Ex. 8, *Marconi Depo* at 41, 100). She was also previously hired for long-term substitute positions without being subject to the interview process. (*Id.* at 38).

opening until she received the recommendation to fill it with the successful candidate, Berger. (*Id.*).

Beyond these threshold disputes, the Court further holds that a reasonable jury could credit all of the following evidence in favor of Marconi which, considered collectively in the light most favorable to Marconi, could undermine the District's proffered reasons for not hiring her. *See Snooks v. Duquesne Light Co.*, 314 F. App'x 499, 505 (3d Cir. 2009) (district court should not parse each issue but rather review the record in its entirety). The jury may accept Marconi's account that she was told that the District hired a more qualified candidate, (Docket No. 55 at ¶ 74), and find that Moon has presented inconsistent and expanding reasons for failing to hire her for this position since she made her claim initially. *See Fuentes*, 32 F.3d at 764–65. Marconi has shown that Moon told the E.E.O.C. that it hired Berger based on her interview scores and a review of her resume but now has presented additional litigation based reasons for the decision, (Docket No. 55 at ¶¶ 75-76), all of which Marconi denies or points out are contradicted by her performance evaluations and the testimony of other Moon witnesses. Such additional reasons include that: there were concerns about her ability to establish relationships with students; she dressed unprofessionally wearing low cut, form fitting tops and short skirts; and there were concerns about her delivery of the curriculum. (*Id.* at ¶ 76). Once again, Marconi can also point to her qualifications vis-à-vis the lesser academic credentials and few months of substitute teaching experience of the significantly younger successful candidate, Berger, to raise a jury issue of whether she was discriminated against. *See Ash v. Tyson Foods, Inc.*, 546 U.S. at 457; *see also Tomasso*, 445 F.3d at 706. Finally, Berger is the fifth[8] substantially younger candidate hired over Marconi by the District over a relatively short period of time, which may

---

[8] The four successful and substantially younger candidates from the 2010-2011 school year were Wilson; Mangan; Tonio; and Ciafre. *See* § V.A.1., *supra*.

circumstantially show age-based discriminatory animus. *See Anderson*, 621 F.3d at 277 (pretext may be shown through evidence that the defendant had previously subjected the same plaintiff to "unlawful discriminatory treatment").

For these reasons, Moon's Motion for Summary Judgment [31] as to the 2011-2012 school year is denied.

### 3. 2012-2013 School Year

With respect to the third school year, 2012-2013, Moon challenges the sufficiency of Marconi's *prima facie* case. (Docket No. 34). Moon does not dispute that Marconi was 46 years old when it filled two open permanent English teaching positions in the District by hiring Berger, who was then 25, at the high school and Kady Wagner, who was also 25, at the middle school. (*Id.*). However, Moon argues that Marconi did not apply for either of the two permanent English teaching positions which were open at that time. (*Id.*). Marconi counters that she has presented sufficient evidence to meet her burden to withstand the District's Motion on this issue. (Docket No. 38).

The United States Court of Appeals for the Third Circuit has held that "the failure to formally apply for a job opening will not bar a [ … ] plaintiff from establishing a prima facie claim of discriminatory hiring, as long as the plaintiff made every reasonable attempt to convey his/her interest in the job to the employer." *Equal Employment Opportunity Commission v. Metal Service Company*, 892 F.2d 341, 348 (3d Cir. 1990); *see also Lula v. Network Appliance, Inc.*, 245 F. App'x 149, 153 (3d Cir. 2007). In this Court's estimation, viewing the evidence of record in the light most favorable to Marconi, as this Court must, the evidence presented is sufficient for a reasonable jury to conclude that she made every reasonable attempt to convey her interest in the 2012-2013 openings to the District, and there are genuine disputes of material fact in the

record which preclude the entry of summary judgment in favor of Moon.

Specifically, the parties clearly dispute whether Moon posted this position on PA Educator and if Marconi applied via that system but the District advised the EEOC on August 10, 2012 that in addition to the PA Educator system, it "continues to accept applications on site." (Def. Ex. W, 32-8, at 3, n.1). Marconi testified that she mailed applications to two District administrators in the summer of 2012 along with a cover letter expressing interest in any open positions she may have been qualified for in the upcoming school year and sent a follow-up email to one of these administrators, Zurchin, but Moon denies that it received these applications. (Docket No. 55 at ¶¶ 142-144). Further, despite Moon's earlier protestations to the contrary, Marconi was on the substitute list for the 2011-2012 school year,[9] (Pl. Ex. 43), and it was the District's practice to consider individuals who were on the substitute list for open permanent teaching positions in the next school year as the administrative assistant would pull those files for review by administrators. (*See Brown Depo* at 22-25, Pl. Ex. 2). Finally, Balaski – who interviewed Marconi for an opening during the prior school year and was involved in the hiring process for the next year – testified that Marconi may have been on the initial list of applicants he reviewed. (Docket No. 41-1, *Balaski Depo* at 179). He also explained that he could not "say that [Marconi's] name wasn't in my head" as a potential candidate for the 2012-2013 permanent teaching positions but added that he did not consider interviewing her because he "didn't feel that she was the same quality candidate as the other three" individuals that the District actually interviewed. (*Id.*). Overall, the Court believes that a reasonable jury could credit such evidence in favor of Marconi and conclude that she did enough to apply for those positions consistent with Third Circuit precedent. *See Metal Service Co.*, 892 F.2d at 348.

---

[9] The Court notes its chagrin that this document was not produced by Moon until after the Court's Motion Hearing. (*See* Pl. Ex. 43).

Accordingly, the Court finds that Marconi has satisfied her burden to present sufficient evidence to establish a *prima facie* case. *Id.* As Moon's legitimate nondiscriminatory reason for not hiring Marconi for this period– i.e., that she did not apply for the positions – is the same as the above challenge to the *prima facie* case, and Marconi has presented sufficient evidence, which taken as true, undermines this reason, there are clearly disputes of material fact which preclude summary judgment in favor of the District. *See Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 370 (3d Cir. 2008) ("[P]rima facie case and pretext inquiries often overlap. As our jurisprudence recognizes, evidence supporting the prima facie case is often helpful in the pretext stage."). Like Marconi's other claims, Moon's alternative argument that Balaski had other, legitimate nondiscriminatory reasons[10] for not interviewing her or hiring her for this school year may be viewed by the jury as a *post hoc* rationalization. *See Tomasso*, 445 F.3d at 706. Indeed, its shifting positions have been proven inaccurate at least in part as Moon has now presented the 2011-2012 substitute list demonstrating that Marconi was on the list, despite Moon's earlier denials. (Pl. Ex. 43). Additionally, the hires of Berger and Wagner were the sixth and seventh instances of Moon disfavoring Marconi[11] and hiring substantially younger individuals for positions, which may show pretext. *See Anderson*, 621 F.3d at 277. Therefore, Moon's Motion for Summary Judgment [31] is denied on this claim as well.

## B. Retaliation Claims

The Court now turns to its evaluation of Marconi's retaliation claims under the ADEA[12]

---

[10]    Among these reasons is the disputed phone call wherein Balaski claims Marconi acted unprofessionally and hung up the phone on him; which she categorically denies. (*Balaski Depo* at 145-146, 180, 185; *Marconi Depo* at 117-118). Such diametrically opposed evidence precludes summary judgment.

[11]    *See* n.8, *supra*.

[12]    The anti-retaliation provision of the ADEA prohibits "an employer [from] discriminat[ing] against any of his employees ... because such individual ... has opposed any practice made unlawful by this section, or because such individual ... has made a charge, testified, assisted or participated in an investigation, proceeding, or litigation under this chapter." 29 U.S.C. § 623(d).

and PHRA[13] which focus on the hiring periods in 2011-2012 and 2012-2013, and are discussed at length above. (Docket Nos. 34, 38). Like the age discrimination claims, the *McDonnell Douglas* burden shifting framework is applied to analyze retaliation claims. *See Daniels v. School Dist. of Philadelphia*, 776 F.3d 181, 192-93 (3d Cir. 2015) (ADEA and PHRA retaliation claims evaluated under *McDonnell Douglas*). A plaintiff makes out a *prima facie* case of retaliation by showing that: she engaged in protected activities; (2) the employer took an adverse action against her; and (3) a causal link exists between the employee's protected activities and the employer's adverse action. *Id.* (citing *Marra v. Phila. Hous. Auth.*, 487 F.3d 286, 300 (3d Cir. 2007) (further quotation omitted). The *McDonnell Douglas* burden shifting procedures noted above remain the same in this context – with the employer responding to the *prima facie* case by producing its legitimate nondiscriminatory reasons for the decision and the plaintiff countering with her evidence of pretext. *Id.* All the while, it remains the plaintiff's burden of persuasion to demonstrate that she was not hired due to unlawful retaliation. *Id.*

Except as discussed below, the parties appear to agree that Marconi has met the first two elements for these challenged employment actions because: (1) she filed EEOC complaints in 2010 and 2011; and (2) she sustained subsequent adverse actions because she was not hired by the District for open positions in the 2011-2012 and 2012-2013 school years.[14] (Docket Nos. 34, 38). Hence, only the causation element of Marconi's *prima facie* case remains at issue. The Third Circuit recently summarized its relevant precedent on this third element of causation:

> "We consider 'a broad array of evidence' in determining whether a sufficient causal link exists [for a plaintiff] to survive a motion

---

[13]    The PHRA provides that it is unlawful "[f]or any person, employer, employment agency or labor organization to discriminate in any manner against any individual because such individual has opposed any practice forbidden by this act, or because such individual has made a charge, testified or assisted, in any manner, in any investigation, proceeding or hearing under this act." 43 Pa. Stat. § 955(d).

[14]    Although it is not clear from Moon's arguments, to the extent that it claims that it is not liable for retaliation due to Marconi's alleged failure to apply for the 2012-2013 openings; genuine disputes of material fact preclude the entry of summary judgment on this issue, as the Court has explained above. *See* § V.A.3., *supra*.

for summary judgment." [*LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007)] (quoting *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 284 (3d Cir. 2000)). To demonstrate a link between protected activity and an employer's adverse action, a plaintiff may rely on the temporal proximity between the two if "unusually suggestive." *Id.*; [*Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 302 (3d Cir.2007)]. In the absence of such a close temporal proximity, we consider the circumstances as a whole, including any intervening antagonism by the employer, inconsistencies in the reasons the employer gives for its adverse action, and any other evidence suggesting that the employer had a retaliatory animus when taking the adverse action. *See LeBoon*, 503 F.3d at 232–33; *Marra*, 497 F.3d at 302; *Farrell*, 206 F.3d at 280–81. The plaintiff, however, cannot establish that there was a causal connection without some evidence that the individuals responsible for the adverse action knew of the plaintiff's protected conduct at the time they acted. *See Andreoli v. Gates*, 482 F.3d 641, 650 (3d Cir. 2007); [*Moore v. City of Philadelphia*, 461 F.3d 331, 351 (3d Cir. 2006)]; *cf. Ambrose v. Twp. of Robinson*, 303 F.3d 488, 493 (3d Cir. 2002) ("It is only intuitive that for protected conduct to be a substantial or motiving factor in a decision, the decisionmakers must be aware of the protected conduct.").

*Daniels*, 776 F.3d at 196-97.

This is not a straightforward case of temporal proximity between the protected activity and adverse action as Marconi filed both of the relevant charges during the fall terms but was then not hired after interviews were conducted in the summers before the subsequent school years. However, it is this Court's reasoned judgment that there are disputed facts in the record pertaining to whether and when the relevant decision makers at Moon knew about Marconi's protected activities such that a reasonable jury crediting her version of events could find in her favor.

While the record shows that Milanovich lacked direct hiring authority, it is undisputed that she was the *de facto* decisionmaker[15] at Moon as each of the Board Members testified that

---

[15]     The Supreme Court of the United States has recognized that the *de facto* decisionmaker is "the technical decisionmaker or the agent for whom he is the 'cat's paw.'" *Staub v. Proctor Hosp.*, 562 U.S. 411, 131 S.Ct. 1186,

they relied on her hiring recommendations and always followed them. (Docket No. 39 at ¶¶ 40-43). Board Members who voted on the new hires were not even aware of the names of the unsuccessful candidates who – like Marconi – had interviewed but were not recommended for hire. (*Id.*). Milanovich was also aware of Marconi's EEOC filings. (Docket No. 55 at ¶ 168; *Milanovich Depo* at 87-89). She testified that she shared them with the assistant superintendent in charge of human resources, a position which was vacant at the time of Marconi's first EEOC filing in September of 2010 and later held by Zurchin. (*Id.*). Moon also advised in its Answers to Interrogatories that Milanovich and Zurchin were two individuals at Moon who had investigated Marconi's claims of discrimination. (Pl. Ex. 41, Docket No. 47-21 at 8; *Milanovich Depo* at 183). However, at their depositions, both repeatedly downplayed their roles. (*See Milanovich Depo*; *Zurchin Depo*). From this evidence, if credited, a reasonable jury could conclude that Milanovich was more involved with the EEOC charges than she led on during her deposition.

As to the specific hiring decisions, the Court has already noted the disputed nature of the record as to why Balaski decided to open up the 2011-2012 long-term substitute position for interviews. (Docket No. 55 at ¶¶ 78, 168; *Milanovich Depo* at 87; *Balaski Depo* at 139). He testified that Milanovich approved this decision; but she denied even having a conversation with him about it or knowing that Marconi was a candidate. (*Id.*). Later, when Balaski recommended Erin Berger for hire, Milanovich reportedly commented, unprompted, that Marconi would "was not going to be happy not being chosen as the candidate." (Docket No. 55 at ¶ 170). She then told Balaski about Marconi's complaint against the District. (*Id.*). Balaski shared this news with Kazmierczak, who was also on the hiring committee. (*Id.*). Milanovich chose not to conduct any further interviews. Instead, she took the recommendation to the Board, which authorized the

1192 (2011).

hire of Berger. This evidence, viewed in light most favorable to Marconi, suffices to demonstrate retaliatory animus by the District at the time the hiring decision was made for the long-term substitute position. *See Daniels*, 776 F.3d at 196-97 (plaintiff must produce some evidence that decisionmakers were aware of the protected activity prior to acting).

Additionally, Zurchin testified that she recalled being told by someone, possibly Milanovich, that Marconi was wearing inappropriate clothing at school around this time, (*Zurchin Depo* at 83), and such negative comment could be interpreted by the jury as evidence of intervening antagonism. *See Daniels*, 776 F.3d at 196-97. Finally, the Court has already pointed out the District's shifting theories and reasons for not hiring Marconi for this position in the context of its discussion of pretext on the age discrimination claim above and need not restate it here. *See* § V.A.2, *supra*. It suffices to say that Marconi has met her *prima facie* burden on this retaliation claim.

The Court similarly opines that the evidence viewed in Marconi's favor warrants the presentation of her retaliation case resulting from the District's failure to interview and/or hire Marconi for the 2012-2013 permanent positions to a jury. *Id.* Again, to the extent that the jury concludes that she applied for those positions, the causation case is easily established on this record as numerous Moon administrators were aware of her protected activity and participated in this hiring process during which she was not granted an interview.

The interviewing and hiring for these positions took place in July and August of 2012. Marconi testified that she mailed two applications directly to administrators, including Zurchin, and also sent her a follow-up email; all of which the District denies. (Docket No. 55 at ¶¶ 142-144). The *de facto* decisionmaker, Milanovich, admitted during her deposition that she provided information to the District's lawyers in preparing its Position Statement to the EEOC, which is

dated August 10, 2012. (*Milanovich Depo* at 183). Thus, the timing is suspect as it appears that the District was simultaneously preparing its response to Marconi's discrimination charges and refusing to interview her for these positions. Balaski screened the applications and cannot recall if he reviewed Marconi's application or not. (Docket No. 55 at ¶¶ 135-136). But, he claimed in his deposition that he would not have interviewed Marconi anyway based on her unprofessional response when he informed her of the District's decision to not hire her in 2011-2012; facts which Marconi contests, as noted above. (*Balaski Depo* at 145-146, 180, 185; *Marconi Depo* at 117-118). Kazmierczak was once again on the interview team and could not recall why Marconi was not considered, despite her previous recommendation that Marconi "radiates" in her classroom. (Docket No. 55 at ¶¶ 38-39, 138). The District also claimed that Marconi was not on its substitute list in order to refute her argument that she should have been considered as an applicant but her name "magically" appeared on the substitute list that was produced by the District after the Court's motion hearing. (*See* Docket No. 54 at 12; Pl. Ex. 43).

Overall, the Court believes that Marconi has presented sufficient evidence from which a reasonable jury could conclude that Moon refused to hire her during the 2011-2012 and 2012-2013 school years in retaliation for her filing EEOC charges against the District in 2010 and 2011. *See Daniels*, 776 F.3d at 196-97. The Court's evaluation of the District's legitimate nondiscriminatory reasons and the pretext evidence with respect to the age discrimination claim outlined above remains the same for the retaliation case. *See* § V.A.3, *supra*. For essentially the same reasons, the Court believes that Marconi has presented sufficient evidence that a reasonable jury could likewise conclude that the District's proffered reasons are a pretext for retaliation and must deny Moon's Summary Judgment Motion [31] on the retaliation claims for its refusal to hire her for those positions.

The only remaining claim between the parties is Marconi's allegation in her Complaint that she was retaliated against after she filed her third EEOC charge on September 20, 2012. (Docket No. 1). It is unclear if Marconi has abandoned or desires to press forward with this claim[16] but the Court finds that it is not sufficiently supported to be presented to a jury. Beyond her EEOC charge, Marconi has not presented any evidence to substantiate a *prima facie* case that she was retaliated against for taking this action. (Pl. Ex. 40). To this end, Marconi admits that she took a position in mid-October 2012 at Service Link, where she remains employed and has not offered any evidence that she applied for any positions at Moon since that time. (Docket No. 39 at ¶ 8; *Marconi Depo* at 51-52). Causation is also lacking as the record is undisputed that no one at Moon was aware of the filing until this litigation ensued and the actual EEOC charge was not produced to the District until a FOIA request was executed by Plaintiff and responded to by the agency. *See Daniels*, 776 F.3d at 197 ("The plaintiff […] cannot establish that there was a causal connection without some evidence that the individuals responsible for the adverse action knew of the plaintiff's protected conduct at the time they acted."). Accordingly, as Marconi has failed to support this claim, summary judgment must be entered on behalf of Moon as to any claim of retaliation against her for filing this third EEOC charge.

VI.     CONCLUSION

Based on the foregoing, Plaintiff's Motion for Summary Judgment [23] is DENIED and Moon's Motion for Summary Judgment [31] is GRANTED, IN PART, and DENIED, IN PART. An appropriate Order follows.

> *s/Nora Barry Fischer*
> Nora Barry Fischer
> U.S. District Court

---

[16]     In her Response to Moon's Motion for Summary Judgment, Marconi argues that "[t]he record shows that [Moon] retaliated against Marconi when it failed to hire her for the 2011-2012 long-term substitute position and for the two 2012-2013 permanent teaching positions." (Docket No. 38 at 19).

Date:   May 8, 2015
cc/ecf: All counsel of record.